**Opinion filed May 6, 2021**



**In The**

# Eleventh Court of Appeals

_____

## No. 11-19-00203-CR

_____

### JINGBO XU, Appellant

### V.

### THE STATE OF TEXAS, Appellee

**On Appeal from the 42nd District Court**

**Taylor County, Texas**

**Trial Court Cause No. 25401A**

## M E M O R A N D U M   O P I N I O N

The jury convicted Jingbo Xu of sexual assault by penetrating the female sexual organ of K.B. with his finger, a second-degree felony. *See* TEX. PENAL CODE ANN. § 22.011(a)(1)(A), (f) (West Supp. 2020). The jury assessed his punishment at confinement for six years in the Institutional Division of the Texas Department of Criminal Justice.

In a sole issue on appeal, Appellant argues that the trial court erred during the guilt/innocence phase of trial by admitting the testimony of eight witnesses who

alleged improper sexual contact by Appellant *during the month prior to* the date on which the victim, K.B., was assaulted. We affirm.

## I. *Background Facts*

Appellant worked as a masseur at the Mall of Abilene for three months, having previously worked as a masseur in China and New York for approximately ten years. On January 1, 2013, K.B. decided to get a massage to relieve back pain that she was experiencing after taking part in a sale at Dillard's. Having been to the same massage parlor in the past, K.B. intended to pay for and receive a chair massage for $20. However, Appellant persuaded K.B. to purchase the $30 full-body massage.

K.B. complained of hip pain. Appellant lowered her pants while she was lying facedown on a massage table, which did not immediately alarm K.B. Appellant began massaging K.B.'s neck "really, really fast," working his way lower on her body. Appellant touched both of K.B.'s breasts and nipples momentarily, which K.B. assumed was an innocent mistake at the time. Appellant worked his way down and began massaging K.B.'s buttocks. Appellant got very close to K.B.'s anus, which made her uncomfortable and confused. Appellant then penetrated her vagina with his finger. K.B. testified that she went into a state of shock, concerned that Appellant would attempt to rape her. K.B. did not see Appellant's finger penetrate her vagina, but was confident that she felt him do so. K.B., infuriated with Appellant, demanded his business card, loudly cursed him at the front desk, and then proceeded to the parking lot of the mall where she called her father, who told her to inform the police.

Sergeant Jake Weise, an officer with the Abilene Police Department at the time, responded to K.B.'s call. Sergeant Weise testified that he made contact with K.B. and that she appeared visibly upset. K.B. accompanied Sergeant Weise into the massage parlor to identify Appellant. Sergeant Weise made contact with Appellant but could not communicate with him due to Appellant's inability to speak

2

English. Sergeant Weise's report reflected that he originally believed K.B. had fallen asleep during her massage, based on his conversation with K.B.

K.B. testified that she takes prescribed pain medication to cope with high levels of hip and lower back pain. K.B. takes hydrocodone and gabapentin for pain, as well as Lunexa as a sleep aid. K.B. admitted to taking hydrocodone and gabapentin on the afternoon of the incident and said that she possibly took hydrocodone only twenty minutes prior to the massage. She denied ever falling asleep during the massage. K.B. testified that gabapentin does not cause her to become drowsy and that hydrocodone causes her to become energized.

Jeff Cowan, a detective with the Abilene Police Department's Crimes Against Persons Unit, was assigned as lead detective in this case. Detective Cowan testified that, after the initial report was taken and publicized, the case "kind of snowballed" as other victims came forward. Detective Cowan testified that a Sexual Assault Nurse Examination likely would not have revealed forensic evidence of digital penetration; therefore, K.B. never received a SANE.

Appellant stated that he had never received any complaints about his massage services. He maintained that assertion on cross-examination. During the guilt/innocence phase of trial, numerous witnesses came forward with testimony regarding prior instances of inappropriate sexual contact by Appellant during massages. Each of these witnesses testified at a hearing outside the jury's presence pursuant to a motion in limine to exclude such evidence, but the trial court overruled the motion and allowed the testimony to be heard at trial. Prior to the sworn testimony of each witness, the trial court instructed the jury that it was only to consider the evidence to determine if there was a common scheme or plan by Appellant and not to consider the testimony for any other purpose.

The first witness to take the stand was R.L. R.L. testified that, while receiving a foot massage from Appellant on or about December 3, 2012, Appellant touched

3

her vaginal area over her clothes. Appellant was using a "chopping motion" up R.L.'s leg and touched her vaginal area with the hand he was using on the inside of her thigh. R.L. felt violated but did not contact the police until she saw the news report indicating police were looking for individuals who may have been inappropriately touched by Appellant.

T.W. received an hour-long full-body massage from Appellant sometime between December 15 and December 25, 2012. During the massage, Appellant touched T.W.'s breasts over her clothes. T.W. also testified that, during one portion of the massage, she could feel Appellant's erect penis on her side. T.W. stopped the massage at that point, paid, and left. T.W. did not notify the police at that time, but she did inform the police once she was made aware of the investigation into Appellant's conduct.

C.D. received a full body massage from Appellant on or about December 19, 2012. C.D. remained clothed for the duration of the massage, during which Appellant touched her breast and rubbed her nipple. C.D. felt violated but did not contact police until approximately two weeks later when C.D. became worried that Appellant would do the same thing to someone else.

R.W. received a full body massage from Appellant in December 2012. Appellant massaged her breasts, worked his way down her body, separated her legs, and began rubbing around her vaginal area. R.W. felt violated and confused afterwards, but she did not contact the police until she saw the news story about Appellant's actions.

K.M. received a back massage from Appellant on December 26, 2012. During the massage, Appellant slid his hand down and touched K.M.'s left breast, prompting K.M. to stop Appellant and remark: "[K]eep it to my back and my neck." K.M. testified that "[i]t felt more like an intentional grab; a soft, intentional grab than a

4

graze by any means." K.M. felt uncomfortable but did not contact the police until she saw Appellant on the news.

C.O. and her husband received a couples massage on or about December 27, 2012. While Appellant was massaging C.O.'s gluteal area, he slid his hand down to her vaginal area until C.O. told him to "stop." C.O. did not believe that she was being assaulted, so she continued the massage. Appellant repeated the unwanted physical contact with C.O.'s vaginal area twice more during the massage. C.O. testified that she was shocked and angry and that she proceeded to push Appellant's hand away when he touched her for the third time. C.O. did not immediately notify the police, but did so a day or two later.

C.R. received a back and shoulder massage from Appellant on or about December 28, 2012. During the massage, Appellant massaged the sides of her breasts over her clothes. C.R. felt "[v]ery violated" and ashamed. C.R. did not immediately contact the police, but eventually did so once she saw Appellant on the news.

R.H. received a back and shoulder massage from Appellant on or about December 30, 2012. During the massage, Appellant massaged the sides and top of R.H.'s breasts, stopping short of the nipple area. R.H. testified that she felt uncomfortable but that she did not contact the police until she saw the news report on Appellant.

Appellant testified through an interpreter. Appellant testified that he did not recognize K.B. and that he did not insert his finger into her vagina during a massage. Appellant further testified that he did not recognize any of the other women who testified against him. When asked if he had done what he was being accused of, Appellant replied: "I didn't do anything."

The jury convicted Appellant of sexual assault and sentenced him to six years in prison.

5

## II. *Issue*

Appellant asserts that the evidence of eight extraneous offenses introduced against him denied him of his right to a fair trial. According to Appellant, his alleged inappropriate touching of eight women over their clothing does not justify the introduction of these extraneous offenses during the guilt/innocence phase of trial when the issue in question is whether he sexually assaulted K.B. by penetration. Appellant argues that the only theory that could justify admission of this evidence would be Rule 404(b)(2) of the Texas Rules of Evidence as evidence of modus operandi. However, Appellant asserts that the distinction between touching the eight other women over their clothing and penetrating K.B. would prevent modus operandi from being applicable.

Appellant further asserts that, even if the admission of such testimony under Rule 404(b)(2) was justified, the cumulative evidence in this case was violative of Rule 403 of the Texas Rules of Evidence. Therefore, Appellant asserts that the admission of the eight extraneous offenses was error that harmed Appellant.

For extraneous-offense evidence to be admissible under both Rules 403 and 404(b), it must satisfy a two-pronged test: (1) it must be relevant to a fact of consequence in the case aside from its tendency to show that the defendant acted in conformity with character and (2) its probative value must not be substantially outweighed by unfair prejudice. *Page v. State*, 213 S.W.3d 332, 336 (Tex. Crim. App. 2006).

### A. *Rule 404(b)*

#### 1. *Standard of Review*

"Whether extraneous offense evidence has relevance apart from character conformity, as required by Rule 404(b), is a question for the trial court." *Devoe v. State*, 354 S.W.3d 457, 469 (Tex. Crim. App. 2011) (quoting *Moses v. State*, 105 S.W.3d 622, 627 (Tex. Crim. App. 2003)). "Thus, a trial court's ruling on the

admissibility of extraneous offenses is reviewed under an abuse-of-discretion standard." *Id.* (citing *Prible v. State*, 175 S.W.3d 724, 731 (Tex. Crim. App. 2005)). "As long as the trial court's ruling is within the 'zone of reasonable disagreement,' there is no abuse of discretion, and the trial court's ruling will be upheld." *Id.* (quoting *Prible*, 175 S.W.3d at 731). "A trial court's 404(b) ruling admitting evidence is generally within this zone if there is evidence supporting that an extraneous transaction is relevant to a material, non-propensity issue." *Id.* (citing *Powell v. State*, 63 S.W.3d 435, 438 (Tex. Crim. App. 2001)).

A trial court's ruling to admit evidence will be upheld provided that the trial court's decision "is reasonably supported by the record and is correct under any theory of law applicable to the case." *Carrasco v. State*, 154 S.W.3d 127, 129 (Tex. Crim. App. 2005). Further, we will not reverse a trial court's erroneous admission of evidence unless the error affected the appellant's substantial rights. *See* TEX. R. APP. P. 44.2(b); *Sandoval v. State*, 409 S.W.3d 259, 287 (Tex. App.—Austin 2013, no pet.) (stating that "erroneous admission of evidence is non-constitutional error" and that "[n]on-constitutional error requires reversal only if it affects the substantial rights of the accused").

### 2. Analysis

Rule 404(b) provides that extraneous-offense evidence "is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." TEX. R. EVID. 404(b)(1). Evidence of other offenses, however, may be admissible when the evidence is relevant to a fact of consequence in the case. *See* TEX. R. EVID. 404(b)(2); *Montgomery v. State*, 810 S.W.2d 372, 387–88 (Tex. Crim. App. 1991) (op. on reh'g). For instance, evidence of other crimes or wrongs may be admissible if it tends to establish some elemental fact, such as identity, intent, or knowledge; tends to establish some evidentiary fact, such as motive, opportunity, plan, or preparation, leading inferentially to an

elemental fact; or rebuts a defensive theory by showing, e.g., absence of mistake or lack of accident. *Montgomery*, 810 S.W.2d at 387–88; *see also* TEX. R. EVID. 404(b)(2). If the trial court determines that the offered evidence has independent relevance apart from or beyond character conformity, the trial court may admit the evidence and instruct the jury that the evidence is limited to the specific purpose the proponent advocated. *Prince v. State*, 192 S.W.3d 49, 54 (Tex. App.—Houston [14th Dist.] 2006, pet. ref'd) (citing *Montgomery*, 810 S.W.2d at 387–88). Rule 404(b)(2) is a rule of inclusion, not exclusion. *De La Paz v. State*, 279 S.W.3d 336, 343 (Tex. Crim. App. 2009). "[E]vidence of a defendant's particular modus operandi is a recognized exception to the general rule precluding extraneous offense evidence, if the modus operandi evidence tends to prove a material fact at issue, other than propensity." *Martin v. State*, 173 S.W.3d 463, 468 (Tex. Crim. App. 2005) (quoting *Owens v. State*, 827 S.W.2d 911, 915 (Tex. Crim. App. 1992)).

Evidence of extraneous offenses showing the modus operandi of a defendant has been held to be admissible to prove identity, which was not at issue in the present case, and also to prove intent or lack of consent. *See Casey v. State*, 215 S.W.3d 870, 881 (Tex. Crim. App. 2007). The Texas Court of Criminal Appeals has held that, for evidence of an extraneous offense to be admissible to prove identity "by comparing common characteristics," the extraneous offense "must be so similar to the charged offense that the offenses illustrate the defendant's 'distinctive and idiosyncratic manner of committing criminal acts.'" *Page*, 213 S.W.3d at 336 (quoting *Martin*, 173 S.W.3d at 468). "[T]he theory of relevancy is usually that of *modus operandi* in which the pattern and characteristics of the charged crime and the uncharged misconduct are so distinctively similar that they constitute a 'signature.'" *Segundo v. State*, 270 S.W.3d 79, 88 (Tex. Crim. App. 2008). The signature must be apparent from a comparison of the circumstances in both cases.

8

*Page*, 213 S.W.3d at 336 (citing *Bishop v. State*, 869 S.W.2d 342, 346 (Tex. Crim. App. 1993)).

In determining whether the similarity between the offenses is sufficient, the court should consider both the specific characteristics of the offenses and the time interval between them. *Johnson v. State*, 68 S.W.3d 644, 651 (Tex. Crim. App. 2002). "No rigid rules dictate what constitutes sufficient similarities; rather, the common characteristics may be proximity in time and place, mode of commission of the crimes, the person's dress, or any other elements which mark both crimes as having been committed by the same person." *Segundo*, 270 S.W.3d at 88. "Usually, it is the accretion of small, sometimes individually insignificant, details that marks each crime as the handiwork or *modus operandi* of a single individual." *Id.* Remoteness or dissimilarity does not per se render an extraneous offense irrelevant on the issue of identity. *Thomas v. State*, 126 S.W.3d 138, 144 (Tex. App.—Houston [1st Dist.] 2003, pet. ref'd).

Furthermore, it is well settled that extraneous-offense and prior-bad-acts evidence is admissible to rebut a defensive theory. *See, e.g.*, *Powell*, 63 S.W.3d at 439. Rebuttal of a defense means introducing evidence that contradicts some aspect of the defense itself. *Roberts v. State*, 29 S.W.3d 596, 601 (Tex. App.—Houston [1st Dist.] 2000, pet. ref'd). In raising a defensive theory, a defendant opens the door for the State to offer rebuttal testimony concerning an extraneous offense if the extraneous offense has characteristics common with the offense for which the defendant is being tried. *Id.*; *Faison v. State*, 59 S.W.3d 230, 242 (Tex. App.—Tyler 2001, pet. ref'd). It is also true that extraneous-offense evidence that rebuts a defensive theory is relevant. *Rankin v. State*, 974 S.W.2d 707, 718 (Tex. Crim. App. 1996) (op. on reh'g). Generally, the defensive theory the State wishes to rebut through extraneous-offense evidence must be elicited on direct examination by the

defense and cannot be elicited by prompting or maneuvering by the State. *Roberts*, 29 S.W.3d at 601.

Appellant cites *Owens* for the proposition that the extraneous offenses were too dissimilar from the charged crime to constitute a modus operandi under Rule 404(b). 827 S.W.2d at 915. Appellant asserts that there is not sufficient similarity between the penetration in this case and mere touching in the extraneous offenses so as to "earmark" the "handiwork" of Appellant. *See id.* Therefore, Appellant argues that the admission of these eight extraneous offenses under Rule 404(b)(2) was erroneous.

The State asserts that the evidence concerning the manner of offending and the number of victims also has relevance apart from character conformity under the "doctrine of chances," encompassed within modus operandi, because the evidence tends to rebut Appellant's defensive theory that K.B. was asleep or intoxicated on prescription medication and, therefore, was mistaken as to what happened, or did not happen, during her massage. The State also contends that *Owens* is inapposite here due to the nature of Appellant's charged offense and the striking similarity of the extraneous offenses. We agree with the State's analysis.

The Court of Criminal Appeals has discussed the intersection of the doctrine of chances and modus operandi:

> Although the *modus operandi* theory of admissibility under Rule 404(b) usually refers to evidence offered to prove the identity of a specific person, its use is not so limited in the law. *Modus operandi* may also encompass the "doctrine of chances" theory to show lack of consent, motive, and the manner of committing an offense. We have recently noted that "evidence of a remarkably similar act might be admissible to prove the *corpus delicti* (the crime itself), intent, or lack of consent under 'the doctrine of chances.'" *Daggett v. State*, 187 S.W.3d 444, 453 n.18 (Tex. Crim. App. 2005); *see also Martin v. State*, 173 S.W.3d 463, 467–68 (Tex. Crim. App. 2005) (lack of consent); *Robbins v. State*, 88 S.W.3d 256, 265–69 (Tex. Crim. App. 2002)

10

(COCHRAN, J. concurring) (corpus delicti); *Plante v. State*, 692 S.W.2d 487, 491–92 (Tex. Crim. App. 1985) (intent).

*Casey*, 215 S.W.3d at 881.

"The 'doctrine of chances' tells us that highly unusual events are unlikely to repeat themselves inadvertently or by happenstance." *De La Paz*, 279 S.W.3d at 347. That is,

> if A while hunting with B hears the bullet from B's gun whistling past his head, he is willing to accept B's bad aim . . . as a conceivable explanation; but if shortly afterwards the same thing happens again, and if on the third occasion A receives B's bullet in his body, the immediate inference (i.e., as a probability, perhaps not a certainty) is that B shot at A deliberately; because the chances of an inadvertent shooting on three successive similar occasions are extremely small.

*Id.* (alteration in original). Similarly, the random chance that a masseur at the Mall of Abilene sexually assaulted a client decreases significantly when it is learned that the same masseur inappropriately touched eight other women *during the month prior to* the sexual assault.

Here, Appellant asserted that he did not inappropriately touch K.B. and that K.B. was likely asleep during the massage as a result of taking prescription medication shortly before she entered the massage parlor. Appellant's opening statement made mention of the asserted defensive theory that K.B. was asleep and, therefore, was mistaken in her allegations. Appellant cross-examined K.B. on the issue and reiterated the defensive theory during his closing argument. The details of the extraneous offenses established that Appellant had committed similar offenses on other occasions in the weeks surrounding the sexual assault of K.B. This evidence made Appellant's defensive theory that K.B. was asleep and mistaken about what occurred during her massage less believable because Appellant had committed similar acts on prior occasions. This evidence rebutted Appellant's claim that he was innocent and had never acted in an unprofessional manner as a masseur.

11

Accordingly, the trial court did not abuse its discretion by determining that this evidence was admissible either (1) to rebut Appellant's defensive theory that K.B. was asleep and unaware of what actually occurred during her massage or (2) for the noncharacter-conformity purpose of showing modus operandi under the "doctrine of chances." *See De La Paz*, 279 S.W.3d at 348; *see also Bass v. State*, 270 S.W.3d 557, 563 (Tex. Crim. App. 2008); *Owens*, 827 S.W.2d at 914.

### B. Rule 403

#### 1. Standard of Review

Even if extraneous-offense evidence is relevant under Rule 404(b), the trial court may exclude it under Rule 403 if its probative value is substantially outweighed by a danger of unfair prejudice. TEX. R. EVID. 403; *see Martin*, 173 S.W.3d at 467. Rule 403 favors the admission of relevant evidence and carries a presumption that relevant evidence will be more probative than prejudicial. *Gallo v. State*, 239 S.W.3d 757, 762 (Tex. Crim. App. 2007); *Casey*, 215 S.W.3d at 879.

We review trial court rulings on Rule 403 grounds for abuse of discretion, *Pawlak v. State*, 420 S.W.3d 807, 810 (Tex. Crim. App. 2013), affording trial courts a high level of deference regarding admissibility. *Robisheaux v. State*, 483 S.W.3d 205, 218 (Tex. App.—Austin 2016, pet. ref'd). Though not exclusive, the factors that courts balance when performing a Rule 403 analysis are:

> (1) the inherent probative force of the proffered item of evidence along with (2) the proponent's need for that evidence against (3) any tendency of the evidence to suggest [a] decision on an improper basis, (4) any tendency of the evidence to confuse or distract the jury from the main issues, (5) any tendency of the evidence to be given undue weight by a jury that has not been equipped to evaluate the probative force of the evidence, and (6) the likelihood that presentation of the evidence will consume an inordinate amount of time or merely repeat evidence already admitted.

*Gigliobianco v. State*, 210 S.W.3d 637, 641–42 (Tex. Crim. App. 2006); *see Davis v. State*, 329 S.W.3d 798, 806 (Tex. Crim. App. 2010) (explaining that "probative value" refers to how strongly evidence makes existence of "fact of consequence" "more or less probable" and to how much proponent needs evidence and that "unfair prejudice" refers to how likely it is that evidence might result in decision made on "improper basis," including "an emotional one" (quoting *Casey*, 215 S.W.3d at 879)).  All evidence is "likely to be prejudicial to one party or the other."  *Davis*, 329 S.W.3d at 806.  "It is only when there exists a clear disparity between the degree of prejudice of the offered evidence and its probative value that Rule 403 is applicable."  *Id.* (citing *Williams v. State*, 958 S.W.2d 186, 196 (Tex. Crim. App. 1997)).

### 2. Analysis

Appellant asserts that the probative value of the extraneous offenses is very minimal, as those offenses involved different incidents and did not involve penetration.  In applying the factors listed above, we conclude that the admission of the extraneous-offense evidence detailing Appellant's inappropriate touching of his clients at the massage parlor within one month of the incident with K.B. did not violate Rule 403.  The trial court did not abuse its discretion by determining that the probative value of the evidence was not substantially outweighed by the danger of unfair prejudice.  The inherent probative force of this evidence was its tendency to show that Appellant had the opportunity and intent to commit the sexual assault of K.B. by the same means of massage, and to rebut Appellant's defensive theory that K.B. was voluntarily intoxicated and/or asleep in a manner that left her unable to accurately depict or recollect what happened during the course of her massage.

The Texas Court of Criminal Appeals has noted that, "in prosecutions for sexual offenses, a successful conviction 'often depend[s] primarily on whether the jury believe[s] the complainant, turning the trial into a swearing match between the

13

complainant and defendant.'" *Wheeler v. State*, 67 S.W.3d 879, 888 (Tex. Crim. App. 2002) (alterations in original) (quoting *Boutwell v. State*, 719 S.W.2d 164, 177–78 (Tex. Crim. App. 1985)). Appellant's conduct in this case left numerous women initially confused as to Appellant's intent to grope them, assuming that his actions were possibly inadvertent. We agree with the State's assertion that, without the testimony of the other victims, a jury may have been left only with K.B.'s testimony to the same effect. Therefore, the extraneous offenses had high probative value to show Appellant's intent, opportunity, lack of mistake, modus operandi, and corpus delicti and to rebut Appellant's defensive theory.

Furthermore, the temporal proximity of the extraneous offenses to the charged crime indicates high probative value to show Appellant's modus operandi. Each of the extraneous offenses occurred within a one-month timeframe of the charged offense. These offenses highlight Appellant's familiarity with the situation that clients like K.B. were in when K.B. was sexually assaulted. Appellant appears to have engaged in illicit conduct when he was able to exert power over female clients in a relaxed, controlled setting, i.e., during a massage. Each of the alleged extraneous offenses occurred in an identical manner as the charged offense, irrespective of whether the contact was over or under clothing or whether he penetrated a sexual organ or not. Appellant would begin a massage on a female client and eventually touch her breasts and nipples; he even touched the vaginal area of some of the women who testified during this trial. We acknowledge that the numerous extraneous offenses were not committed in an exactly identical fashion as the charged offense, but this extraneous-offense evidence, having a strikingly similar pattern among many clients in a short period of time, need not be completely identical to the charged offense in order to be probative. *Page*, 213 S.W.3d at 338.

While we understand the inherently inflammatory and indelible nature of sexually related misconduct, we disagree with Appellant's assertion that, in this case,

14

the testimony influenced the jury in an irrational way or suggested a decision on an improper basis. The extraneous-offense evidence related directly to Appellant's modus operandi, and the trial court instructed the jury that it was to consider evidence of the extraneous bad acts only for the limited purpose of determining whether the evidence tended to prove a common scheme or plan by Appellant. The trial court further instructed the jury that any extraneous event could be considered only if proved beyond a reasonable doubt. Additionally, presentation of the evidence did not consume an inordinate amount of time. Although the State called eight witnesses to testify concerning Appellant's prior conduct, the testimony from the women describing the inappropriate conduct of Appellant was not extensive. The record does not show that the State had other probative evidence available to rebut Appellant's assertion that he had never acted unprofessionally and that he did not inappropriately touch any of his clients, especially K.B. Accordingly, the trial court could reasonably have determined that the probative value of the evidence of extraneous events was not substantially outweighed by the risk of its unfair prejudice. *See De La Paz*, 279 S.W.3d at 343–44; *Martin*, 173 S.W.3d at 467.

We, therefore, conclude that the trial court's admission of Appellant's past conduct was within the zone of reasonable disagreement and did not constitute an abuse of discretion. *See Devoe*, 354 S.W.3d at 469.

*C. Harm*

Even if admission of evidence concerning any of the extraneous offenses was erroneous, we will not reverse unless its admission affected Appellant's substantial rights. TEX. R. APP. P. 44.2(b) ("Any [non-constitutional] error, defect, irregularity, or variance that does not affect substantial rights must be disregarded."). We do not see such harmful error in the trial record. The trial court orally instructed the jury before presentation of each extraneous offense and instructed it again in the jury charge as to how the jury could use evidence of the extraneous offenses, i.e., only to

15

prove a common scheme or plan by Appellant. We generally presume that the jury follows the trial court's instructions in the manner presented. *Thrift v. State*, 176 S.W.3d 221, 224 (Tex. Crim. App. 2005). An appellant may refute this presumption, but he must do so by pointing to evidence that the jury failed to follow the instruction. *Id.* Appellant has not identified any such evidence in this case. The court's charge further gives the jury instruction that the extraneous offenses must have been proven beyond a reasonable doubt for it to consider same, and even then, solely for the limited purpose of showing course of conduct or scheme. We cannot say that the admission of evidence of the extraneous offenses affected Appellant's substantial rights.

Accordingly, we overrule Appellant's sole issue on appeal.

### III. *This Court's Ruling*

We affirm the judgment of the trial court.

W. BRUCE WILLIAMS
JUSTICE

May 6, 2021

Do not publish. *See* TEX. R. APP. P. 47.2(b).

Panel consists of: Bailey, C.J.,
Trotter, J., and Williams, J.